**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1323
_____

LIBERTY BELL BANK

v.

LUIS G. ROGERS; LEASE GROUP RESOURCES INC;
LGR GROUP, INC.; LGR CONSORTIUM INC;
UNIVERSITY COPY SERVICES

LEASE GROUP RESOURCES, INC., Third Party Plaintiff

v.

KONICA MINOLTA BUSINESS SOLUTIONS, INC.; FAX PLUS, INC;
OMNI BUSINESS SYSTEMS, INC., Third Party Defendants

Luis G. Rogers,
Appellant

_____

On Appeal from the United States District Court
for District of New Jersey
(D.C. Civil Action No. 1-13-cv-07148)
District Judge:  Honorable Noel L. Hillman
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 9, 2018
Before:  VANASKIE, COWEN and NYGAARD, Circuit Judges

(Opinion filed: February 13, 2018)

_____

OPINION[*]
_____

PER CURIAM

Appellant Luis G. Rogers appeals from the District Court's orders granting

Appellee Liberty Bell Bank's motion for summary judgment and awarding more than ten

million dollars in damages. For the following reasons, we will affirm.

I.

In 2013, Liberty Bell Bank (LBB) filed a complaint against Rogers and various

entities he owned and controlled, including Lease Group Resources, Inc. (LGR), LGR

Group, Inc., LGR Consortium, Inc., and University Copy Services (collectively the "LGR

Entities"), alleging violations of the federal Racketeer Influenced and Corrupt

Organizations Act (RICO)[1] and the New Jersey RICO act, as well as common law fraud,

theft and conversion, breach of contract, and fraudulent transfer of assets. The complaint

alleged that defendants developed a scheme through which they fraudulently obtained

loans from LBB, and further defrauded it by making payments on the loans using a check

kiting scheme.[2] LBB also alleged a breach of contract claim against LGR, and a breach

of guaranty claim against Rogers. After several hearings, the District Court determined

----

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] See 18 U.S.C. §§ 1962, 1964(c)-(d).

[2] Two other institutions, Susquehanna Bank and Roma Bank (formerly Sterling Bank), alleged that Rogers similarly defrauded them. Roma Bank separately sued Rogers, while Susquehanna Bank intervened in this action.

2

that there was significant evidence of fraud; it appointed a Receiver on behalf of the LGR

Entities, and subsequently ordered the liquidation of certain assets.

In an order entered September 22, 2015, the District Court granted partial

summary judgment to LBB on its federal RICO and breach of contract claims.[3]   It held

that LGR and Rogers were liable for damages in connection with the check kiting

scheme, and that these damages were subject to trebling under the federal RICO statute.

The Court awarded damages of $2,222,299.64 on the breach of contract claim and

granted LBB leave to file a supplemental application with respect to the amount of

damages to be awarded in connection with the RICO claim.  In an order entered January

28, 2016, the District Court granted LBB's second supplemental application for damages

and directed that judgment be entered jointly and severally against Rogers and LGR for

$10,632,186.57 in damages for the RICO claim, plus attorneys' fees and costs.  Rogers

has appealed.[4]

## II.

We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.[5]  We review de

novo a grant of summary judgment.  Groman v. Township of Manalapan, 47 F.3d 628,

---

[3] The Receiver indicated that he had no factual basis to oppose the motion for summary judgment.

[4] No appeal has been taken on behalf of LGR.

[5] Although Rogers' notice of appeal was premature, it ripened when the District Court granted LBB's motion to dismiss the remaining claims, and certified the appeal pursuant to Fed. R. Civ. P. 54(b).  See Cape May Greene, Inc. v. Warren, 698 F.2d 179, 184–85 (3d Cir. 1983) (considering a premature appeal followed by an order dismissing the remaining cross-claim to be an appeal from the final order); see also Tilden Financial

633 (3d Cir. 1995). Where, as here, the adverse party fails to respond to the summary judgment motion, the district court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); see also Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990).[6]

## II.

Because Rogers neglected to file a responsive statement of material facts, the District Court was entitled to deem the statement of facts as admitted. See D.N.J. Local Civ. R. 56.1. In sum, these facts provide the following background. Rogers and the LGR Entities operated an office equipment leasing business. Beginning in 2005, LBB extended over one hundred separate loans to Rogers and LGR to finance the purchase of

Corp. v. Palo Tire Serv., 596 F.2d 604, 607 (3d Cir. 1979) ("If the Court is to permit subsequent finality to validate a premature appeal under § 1291, logic would dictate allowing subsequent certification to validate a similarly premature appeal under Rule 54(b), inasmuch as a 54(b) certification creates a final order under § 1291.").

[6] Rogers failed to respond to the summary judgment motion. In his notice of appeal, he asserted that he responded "to virtually all of the motions filed by" LBB and "[t]his will all be revealed during the appeal process." Although he filed numerous documents and motions with the District Court, including many during the three month period after his response was due, and before the motion was decided, these filings were all in response to the Receiver's motion to sell some of the receivership assets. Indeed, Rogers conceded that he was focused at that time on obtaining capital to fund LGR and aggressively opposing Roma Bank's efforts in their action against him. To the extent Rogers argues that he was denied due process because of the ineffectiveness of his counsel, "[a]n aggrieved party in a civil case, involving only private litigants unlike a defendant in a criminal case, does not have a constitutional right to the effective assistance of counsel." Kushner v. Winterthur Swiss Ins. Co., 620 F.2d 404, 408 (3d Cir. 1980) (internal quotation marks omitted).

equipment intended for lease. The loans were individually secured by the assignment of the equipment leases to which LGR was a party, as well as by an interest in the equipment being financed. Under the majority of the agreements, LGR was to collect the lease payments from the lessees (the end users) and remit them to LBB as payment on the loans. During the same relevant period, Rogers entered into loan agreements with Roma and Susquehanna, which also were secured by equipment leases.

It is undisputed that multiple leases that were assigned to LBB as collateral for loans did not exist either because the end user cancelled the lease or the equipment was never purchased;[7] LBB was never notified that these loans were unsecured, nor were the funds returned to LBB. It is also clear that, in certain cases, the same leases or equipment were pledged as collateral to LBB and Susquehanna Bank. This "double pledging" of collateral allowed Rogers to obtain funds equal to twice the value of the equipment, while leaving the banks, unbeknownst to them, with competing claims to the same collateral. LGR eventually defaulted on 64 loans from LBB, resulting in damages totaling more than $2.2 million.

According to the record, Rogers established checking accounts at LBB, Susquehanna, and Roma on behalf of the LGR Entities. Each of these accounts allowed for next-day availability of funds, enabling Rogers to access funds on deposited checks before the funds were paid by the bank on which they were drawn. On April 11, 2013,

---

[7] LBB maintains that there was $1.2 million in loans for which leases did not exist.

5

Roma Bank, suspicious that defendants were engaged in a check kiting scheme, put a block on the LGR accounts. Despite being notified of the block, Rogers did not alert LBB. The next day, LBB received checks back from Roma that were unpaid. LBB and Susquehanna subsequently put a hold on the LGR Entities' accounts. It was then discovered that, as the District Court described, defendants had "utilize[d] funds and replace[d] funds with ultimately uncollectible checks in a circular fashion" among the three banks. In the end, after LBB applied a series of chargebacks, the LGR accounts were overdrawn by over $2 million. Defendants had also overdrawn their accounts at Susquehanna Bank by $2,890,000, and at Roma Bank by $2,100,000.

## The Federal Rico Claim

A plaintiff in a civil RICO action must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); see 18 U.S.C. § 1962(c). "Racketeering activity" is defined to include specified predicate acts. See 18 U.S.C. § 1961(1). To establish a "pattern" of racketeering activity, LBB must demonstrate that the predicate acts are "related, *and* that they amount to or pose a threat of continued criminal activity." See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989) (emphasis in original). Lastly, LBB must prove that the alleged violations proximately caused its injury. See 18 U.S.C. § 1964(c); Hemi Grp., LLC v. City of N.Y., N.Y., 559 U.S. 1, 9 (2010). Proof by a preponderance of the evidence is sufficient to support a finding of liability under civil RICO. See United States v. Local 560, Int'l Bhd. of Teamsters, 780 F.2d 267, 279–80 &

6

n.12 (3d Cir. 1985); Jennings v. Auto Meter Prod., Inc., 495 F.3d 466, 472 (7th Cir. 2007).

The District Court determined that Rogers and LGR[8] committed the predicate crime of bank fraud, 18 U.S.C. § 1344, which makes it an offense to execute, or attempt to execute, a scheme or artifice (1) to defraud a financial institution *or* (2) to obtain money from it by false or fraudulent means. See United States v. Schwartz, 899 F.2d 243, 246 (3d Cir. 1990). The first subsection requires a showing of intent, while the second does not. See Loughrin v. United States, 134 S. Ct. 2384, 2389-90 (2014) (holding that § 1344(1) "includes the requirement that a defendant intend to 'defraud a financial institution'; indeed, that is § 1344(1)'s whole sum and substance" but "nothing in [§ 1344(2)] additionally demands that a defendant have a specific intent to deceive a bank"). Rogers was found liable for RICO fraud under § 1344(1).

The District Court found that, to avoid defaulting on LGR's bank loans, Rogers executed a check kiting scheme, defrauding LBB, Roma Bank, and Susquehanna Bank out of millions of dollars. A check kiting scheme violates the bank fraud statute. See United States v. Jimenez, 513 F.3d 62, 72 (3d Cir. 2008); see also Shaw v. United States, 137 S. Ct. 462, 468-69 (2016) (distinguishing the circumstances that fall within the scope of § 1344(1) and (2)). There was significant evidence that Rogers, through the LGR Entities, took advantage of the next-day availability allowance to write checks between

---

[8] For the reasons provided by the District Court, we agree that Rogers and the LGR Entities had formed an "association in fact enterprise."

7

and among their accounts at the three banks, funneling funds in and out, while artificially inflating the account balances. "The ability to write checks against provisional credits gives the shrewd bank customer free use of someone else's money. Viewed charitably, this is called aggressive cash management. It also gives the dishonest customer a chance to write checks against non-existent deposits. When done systematically and fraudulently, prosecutors call this criminal check kiting." Laws v. United Mo. Bank of Kansas City, N.A., 98 F.3d 1047, 1048 (8th Cir. 1996). According to an accounting firm hired by Susquehanna Bank to investigate the suspected scheme, the LGR Entities made more than $120 million of deposits and withdrawals across these bank accounts during the month of March 2013 alone, despite having an approximate average *annual* revenue of $7 million to $10 million. Typically, the monthly volume of transactions was significant, but the net effect on the balance was not.[9] The unraveling of the fraudulent scheme began when Roma blocked the LGR Entities' account, and ended with an excess of $7 million in overdrawn accounts among the three banks.

The summary judgment record supports the conclusion that Rogers acted with knowledge and specific intent to use the check kiting scheme to defraud LBB, particularly in light of his extensive business and banking experience (he had served on the board of Sterling Bank), the size of the losses to LBB and the other banks, and, most

---

[9] An LGR account at LBB had $23.4 million in credits and $23.4 million in debits in January 2013, $25.2 million in credits and $25.4 million in debits in February 2013, and $31.8 million in credits and $31.6 million in debits in March 2013.

importantly, the absence of a legitimate purpose for the frequent transactions between the accounts involved. See United States v. Yoon, 128 F.3d 515, 524 (7th Cir. 1997); United States v. Vavlitis, 9 F.3d 206, 213 (1st Cir. 1993). We agree, therefore, that there is no genuine factual dispute that Rogers' actions amounted to racketeering activity.

Because Rogers had deposited multiple checks as part of the scheme, the District Court concluded that he had committed separate violations of the bank fraud statute, and thereby engaged in a "pattern" of racketeering activity. It is clear that each check deposit in a kiting scheme constitutes a separate execution of the scheme to defraud the bank. See Schwartz, 899 F.2d at 248 (stating that § 1344(a) "plainly and unambiguously allows charging each execution of the scheme to defraud as a separate act"). LBB also had to establish, however, that there was "continuity plus relationship" among the predicate acts. Sedima, 473 U.S. at 496 n.14. The acts were clearly related – Rogers and the LGR Entities worked in concert to defraud the three banks using a scheme that depended upon the shifting of the monies between and among the banks to maintain inflated balances. See id. (noting that predicate acts are related when they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics"). The other element, continuity, "is a temporal concept" that can take the form of a closed-ended or open-ended scheme. Hughes v. Consol-Pa Coal Co., 945 F.2d 594, 609 (3d Cir. 1991). When it takes the form of a closed-ended scheme, as the District Court concluded was involved here, the

9

period of time must be "substantial."[10]  Id.  We have recognized that a period of 12 months is too short.  Id. at 611.

The District Court did not determine when the check kiting scheme began, stating only that, "at some point," LGR resorted to the scheme to repay and avoid defaulting on its bank loans.  D. Ct. 9/22/15 Op. at 23.  Although it determined that the "association in fact enterprise" existed "for at least several months, if not years" for the purpose of carrying out the check kiting scheme, the Court made no definitive ruling on this temporal element of the claim.  Id. at 16-17, 19.  In its amended complaint, LBB asserted that "Rogers began in or around 2009 to kite checks drawn on Liberty Bell and the Other Banks."  Am. Compl. at 7.  At summary judgment, it argued more generally that LGR and Rogers "had been check-kiting for some time."  In support, LBB presented evidence that "a high volume of funds" was moved between the accounts at the three banks from January to mid-April 2013.  In the absence of evidence that the check-kiting scheme was underway for a more substantial period of time, however, the District Court erred in concluding that this conduct, by itself, amounted to a "pattern of racketeering."  See H.J. Inc., 492 U.S. at 242 ("Predicate acts extending over a few weeks or months and

---

[10] We agree with the District Court that there is no evidence of an open-ended scheme. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241 (1989) (open-ended conduct refers to "past conduct that by its nature projects into the future with a threat of repetition"). The evidence indicates that the check-kiting scheme arose out of the defendants' efforts to stay current on bank loan payments, rather than as a regular means of doing business, see e.g. Hughes, 945 F.2d at 610, and came to an abrupt end in April 2013.

threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned in RICO with long-term criminal conduct.").

The District Court also determined that Rogers, through LGR, had engaged in bank fraud by failing to purchase equipment that was to secure numerous bank loans. Although it concluded that LBB had failed to produce evidence that Rogers intended to defraud the bank at the time LGR obtained the loan, the District Court found that, "at some point," Rogers "knew that he had borrowed money from Plaintiff to purchase equipment which he never purchased, instead retaining the proceeds and failing to obtain collateral to support the loans," and that, in doing so, he executed a scheme to defraud LBB. Dist. Ct. 9/22/15 Op. at 23-25 & n.5. Rogers denied that he knowingly retained unsecured funds, testifying that he "would simply sign the [lease] documents and take them to the bank to be funded. And there were occasions when, after the fact, for whatever reason, a lease would get canceled or maybe never consummated. But it was not done in any fraudulent manner whatsoever." Dist. Ct. Docket #32 at 66. According to Rogers, he did not know that any lease he had pledged as collateral to LBB had been cancelled or terminated until the bank notified him, after the check-kiting scheme was exposed in April 2013. Id. at 66-71.

Contrary to Rogers' assertions, the evidence demonstrates that he intended to defraud LBB. For example, as the District Court noted, Rogers obtained $588,114.67 in funds from LBB in July 2010, to finance the purchase of 143 copiers from FaxPlus. As collateral, Rogers offered a security interest in Lease No. 5508 between LGR and the

11

Defense Intelligence Agency (DIA), the end user, as well in the underlying equipment.[11]

Rogers neither purchased the copiers nor returned the funds. Moreover, just two months

after obtaining the loan, Rogers misrepresented to FaxPlus in an email that LBB failed to

loan LGR the funds to finance the deal, which was then voided. This was clear evidence

of a scheme to retain unsecured monies, and thereby defraud LBB.

Next, the District Court concluded that Rogers "must have known" that LGR had

"doubly-pledged" leases as collateral to multiple banks, thereby committing bank fraud.

Dist. Ct. 9/22/15 Op. at 25. "[T]he *sine qua non* of a bank fraud violation ... is the intent

to defraud the bank." United States v. Khorozian, 333 F.3d 498, 503 (3d Cir. 2003)

(internal citations omitted). While there is no "smoking gun" evidence establishing

Rogers' intent to defraud the bank in this regard, such as the email to FaxPlus, intent may

be inferred from circumstantial evidence. Jaguar Cars, Inc. v. Royal Oaks Motor Car

Co., 46 F.3d 258, 270 (3d Cir. 1995); see also United States v. Philip Morris USA Inc.,

566 F.3d 1095, 1118 (D.C. Cir. 2009) ("A person's state of mind is rarely susceptible of

proof by direct evidence, so specific intent to defraud may be, and most often is, inferred

from the totality of the circumstances, including indirect and circumstantial evidence.").

The sheer volume of leases that were doubly pledged to LBB and another bank, and the

simultaneous nature of the transactions requiring the same extensive documentation, are

---

[11] Rogers testified that he understood that, pursuant to the security agreements, the loans were provided by LBB based on the assignment of the underlying leases. See 1/30/14 Hearing Tr. at 64-65.

sufficient evidence to demonstrate as a matter of law that Rogers knew he was fraudulently retaining the proceeds of the unsecured loans. As the District Court noted at a hearing, "[W]e have evidence here today that 27 leases were presented to two different banks at the same time. That's fraud. You cannot pledge security for two different loans simultaneously without knowledge [of] the other party to whom the collateral has previously been pledged, or if you're doing it simultaneously that you're presenting it twice." Dist. Ct. Docket #71 at 145: 8-12. No reasonable jury could have concluded otherwise.

We also agree with the District Court that these predicate acts were related. There was a preponderance of evidence indicating that, as the District Court noted, the second predicate act – the check kiting scheme – was born out of the first: without payments from lessees to cover the loans that were unsecured, Rogers developed the check kiting scheme to cover LGR's loan payments. In doing so, he engaged in an overall scheme that extended from at least 2010 to 2013, a period of time sufficient to satisfy the continuity requirement of RICO. See Tabas v. Tabas, 47 F.3d 1280, 1294 (3d Cir. 1995) (holding scheme lasting over three years is "substantial period of time" for purposes of establishing pattern of racketeering activity).

Finally, LBB established that it sustained financial losses totaling $3,544,062.19 as a direct result of Rogers' racketeering activity. See Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992) (explaining that plaintiff must establish a "direct relation between the injury asserted and the injurious conduct alleged"). Specifically, the check-

13

kiting scheme resulted in damages in the form of overdrafts amounting to $2,089,911.04.

The bank also lost $989,861.45 on loans for which there were no supporting leases, and

$464,289.70 on loans for which the equipment leases were doubly-pledged. Because

LBB was entitled to a trebling of its damages, see 18 U.S.C. § 1964(c), the District Court

properly awarded damages in the amount of $10,632,186.57.[12]

For the foregoing reasons, summary judgment was warranted on Liberty Bell

Bank's federal RICO claim, and damages were properly awarded on that claim in the

amount of $10,632,186.57. Accordingly, we will affirm the judgment of the District

Court. Rogers' "Motion for Leave to File Answers As to Within Time" is denied as the

appeal has been fully briefed and no "filing deadlines" were missed. All other

---

[12] Rogers' notice of appeal, filed on February 11, 2016, specified that he sought review of
the District Court's January 14, 2016 order awarding direct damages. Those damages
arose from loans that were not secured by collateral or were secured by doubly-pledged
collateral. On January 28, 2016, the District Court granted LBB's second supplemental
application regarding damages on summary judgment, determining the total damage
award based on the damages assessed in its September 2015 order, including treble
damages, and the damages awarded in its January 14 order; the court entered judgment in
the amount of $10,632,186.57. Generally, our jurisdiction is limited to judgments
specified or "fairly inferred" by the notice of appeal. See Fed. R. App. P. 3(c)(1)(B);
Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 184 (3d Cir. 2010). However, as
Rogers alleges in his "Motion for Leave to File an Additional Supplemental Appendix,"
filed in this Court on August 16, 2017, it appears that he was removed as a party to the
action in the District Court after the January 14 order; therefore, he did not receive notice
of the January 28 order. Because the two orders entered in January 2016 are clearly
connected, Rogers' intent to appeal the order awarding treble damages is apparent, and
because LBB is not prejudiced thereby, we may exercise jurisdiction to consider the
January 28 order. Id. We note that, because the January 28 order merely clarified the
District Court's prior orders, Rogers was not prejudiced by his failure to receive copies of
that order or of the supplemental summary judgment motion.

outstanding motions are denied, including the request to stay that Rogers made within the motion to file a supplemental appendix filed on December 20, 2017.